

# THE ATTORNEY GENERAL
# OF TEXAS

**AUSTIN 11, TEXAS**

PRICE DANIEL
ATTORNEY GENERAL

September 22, 1952

Hon. Raymond E. Magee
County Attorney
Galveston County
Galveston, Texas

Opinion No. V-1528

Re: Number and rate of pay of
precinct election officials
where voting machines are
used; form of paper ballot
to be used for absentee vot-
ing in counties which have
adopted voting machines.

Dear Sir:

You have requested an opinion on the following questions:

1. What is the required number of election
officers for each precinct in which voting
machines are used?

2. What is the rate of pay for election
officials and employees in precincts in which
voting machines are used?

3. Where voting machines have been adopted
for use throughout a county, must the paper
ballot used in absentee voting be the stub ballot
prescribed in Section 61 of the Election Code?

Provisions regulating the conduct of elections in pre-
cincts where voting machines are used are contained in Section
79 of the Election Code (V.C.S. Election Code, Art. 7.14). Your
first question calls for a determination of whether Section 24 of
Section 79 makes it mandatory that the number of election offi-
cials therein authorized be appointed or whether it merely fixes
the maximum number which may serve. The pertinent provisions read
as follows:

"The authorities charged with holding an
election or primary election are directed wherever
possible, in the naming of election officers, to
name for each precinct, in which only one voting
machine is used, a presiding officer and three
(3) clerks for such precinct of opposed interest
in that election or primary election and in each
precinct, in which two (2) or more voting machines
are used, a presiding officer and four (4) clerks

for such precinct of opposed interest in that
election or primary election.  If additional
machines are used above two (2), an additional
clerk may be employed for each additional two
(2) machines.  The number of judges and clerks
herein authorized to be appointed, in all
counties in which elections are conducted by
the use of voting machines, shall be controlling
and shall apply regardless of the provisions
of Sections 15 and 16 . . . . . "

This provision is not in language which is ordinarily
thought of as mandatory.  There is no clear command that the
stated number of officials shall be appointed.  The history of
the statute sheds light on its proper interpretation.  Section
13 of the original statute providing for the use of voting
machines (Acts 41st Leg., 4th C.S. 1930, ch. 33, p. 60; Art.
2997a, V.C.S.) read as follows:

"The presiding officer shall be in general
charge of the poll and shall see that the clerk
of the election properly checks off the name of
each voter from the poll list before such voter
casts his ballot, that the poll tax certificate
or exemption certificate of the voter is stamped
voted with the date of the particular election
or primary election with the rubber stamp pro-
vided under the law or writes 'voted' with the
date with pen and ink if no rubber stamp be pro-
vided, the third election official, besides the
presiding officer and the clerk, shall be a
mechanical expert and his duty shall be to see
that the voting machine is not tampered with and
shall attend the machine at all times.  . . . . "

Section 24 of the statute then read:

"The authorities charged with holding an
election or primary election are directed wherever
possible, in the naming of election officers, to
name for each precinct a presiding officer and a
clerk for such precinct, of opposed interest in
that election, or primary election, the third
official, who should be a mechanical expert, being
wherever possible non-partisan.  . . . . "

As originally enacted, then, the law required the ser-
vices of three officials in conducting elections where voting
machines were used, and it did not authorize the appointment of
more than that number.  It is clear that the direction in Section

24 to the election authorities, "wherever possible," to name
election officers as set out therein referred to the partisan-
ship of the officials and not to the number.

In 1937, the Legislature changed Section 13 so as to
provide, in addition to a presiding officer, that "one or more
of the clerks of the election" should check off the names of
voters, stamp their poll tax receipts, and so on, and that one
of such clerks should attend the voting machine. The provision
in Section 24 which is here under consideration remained unchanged,
although that section was amended by the same act. Acts 45th
Leg., 2nd C.S. 1937, ch. 52, p. 1953. Clearly, the intention of
this amendment was to authorize (but not to require) the appoint-
ment of more than three officials, and no maximum number was fixed.
Section 13 was again amended in 1939, but the change did not
affect the number of election officials. In its present form
Section 13 still provides for a presiding officer who is in gen-
eral charge of the poll, for one or more clerks to check the list
of voters, keep the poll list, etc., and for a clerk to attend
the voting machine.

In 1945 Section 24 was amended for the purpose, as ex-
pressed in the caption of the act, of "limiting the number of
persons who may be appointed to conduct such election or primary
election." Acts 49th Leg., 1945, ch. 280, p. 446. As so amended,
this section read:

> "The authorities  charged with holding an election
> or primary election are directed wherever possible, in
> the naming of election officers, to name for each
> precinct, in which only one voting machine is used,
> a presiding officer and three (3) clerks for such pre-
> cinct of opposed interest in that election or primary
> election and another clerk who should be, whenever
> possible, non-partisan; and in each precinct, in
> which two (2) or more voting machines are used, a
> presiding officer and five (5) clerks for such pre-
> cinct of opposed interest in that election or pri-
> mary election and another clerk who should be,
> wherever, possible, non-partisan. The number of
> judges and clerks herein authorized to be appointed,
> in all counties in which elections are conducted by
> the use of voting machines, shall be controlling and
> shall apply regardless of the provisions of Articles
> 2937 and 2938 of the Revised Civil Statutes of Texas,
> 1925, as amended. . . . ."

Undoubtedly the purpose of the 1945 amendment was to
place a maximum on the number of officers. It is seen, by com-
paring this wording with the present Section 24, quoted earlier

in this opinion, that the change made in the Election Code was to reduce the number of officials who could be appointed where less than four machines are used. A new provision states that an additional clerk may be employed for each additional two machines if more than two machines are used.

From this review of the evolution of the Voting Machine Law, it is our conclusion that the minimum number of election officers is three, and that Section 24 states only the maximum number which may be employed. Section 13, which prescribes the duties of the officers, requires the services of at least three persons; and Section 18 likewise contemplates that at least three officials shall serve. It might be inferred that Section 13 would require an additional clerk to attend each additional voting machine which was used at the polling place, but we think such an inference would be erroneous. Section 24 allows the appointment of only one additional clerk for each additional two machines, so clearly the law does not require that each single machine be attended by a separate person. Within the limits stated in Section 24, it is left to the discretion of the authorities conducting the election to determine how many officials in excess of three are to be appointed, regardless of the number of machines being used at the polling place. However, the authorities should certainly provide a sufficient number of clerks so that proper supervision may be given the machines at all times, as well as providing an adequate number to perform other duties.

Your second question concerns the pay of the election officers and likewise can best be answered by reviewing the history of the provision relating to pay. Section 24 of Section 79 contains the following provision:

"..... For their services election officials and employees shall be paid a sum to be set by the authority charged with holding the election or primary election, but not less than the amount set now by law and not more than Ten Dollars ($10) per day, provided, however that no election official shall be paid more than the prorata part of two (2) hours overtime after the polls are closed......"

The problem here is to determine whether the $10 rate "per day" refers to a 10-hour day or to the entire period during which the polls are open, and whether the official may be paid an amount, in excess of the $10, for overtime during the period the polls are open.

The original voting machine statute enacted in 1930 omitted the proviso relating to overtime pay after closing of the

polls, but was otherwise in the present language. The proviso was added by the 1937 amendment. (See citations supra.) The statute set a minimum of "not less than the amount set now by law." In 1930 the general statute fixing pay of election officials (Art. 2943, V.C.S.) read:

> "Judges and clerks of general and special elections shall be paid three dollars a day each, and thirty cents per hour each for any time in excess of a days work as herein defined. . . . Ten working hours shall be considered a day within the meaning of this article. . ."

In 1937 this statute was amended so as to fix the pay of the election officers in counties of more than 355,000 inhabitants at $5 a day and 50 cents an hour for time in excess of 10 hours. Acts 45th Leg., R.S. 1937, ch. 295, p. 591. In 1945 the pay in all counties of the State was fixed at $5 per day and 50 cents per hour in excess of 10 working hours. Acts 49th Leg., 1945, ch. 87, p. 128.

The language in the Voting Machine Law stating that the election officials should be paid "not less than the amount set now by law" was clearly referable to this general law. So, prior to the adoption of the Election Code, the Voting Machine Law fixed both a minimum and a maximum, the minimum being the amount set out in Article 2943 and the maximum being not more than $10 per day, with a maximum of two hours overtime after the polls were closed. We then come to the question of whether the maximum of $10 per day meant a day of 10 working hours or a day of whatever length the official might actually work while the polls were open.

It is our conclusion that the original Section 24 of the Voting Machine Law meant to fix a maximum of $10 for a day of 10 working hours and that it did not prohibit overtime payment which would make the total exceed $10. The pattern in Article 2943 was to fix a daily rate based on 10 working hours and an hourly rate for overtime at one-tenth of the daily rate. We think the Legislature intended to adopt the same pattern for paying officials under the Voting Machine Law, the only difference being that the daily rate could range between the amount stated in Article 2943 and the $10 daily rate set by the Voting Machine Law.

The addition of the proviso limiting overtime pay to two hours' overtime after the polls are closed indicates that these officials were entitled to overtime pay under the original statute. This proviso is not an authorization for overtime pay but is a restriction on the amount of overtime which could be compensated. Evidently the Legislature was of the view that the duties to be performed after the polls are closed should not require more than two hours, since the ballots are counted on the

machine as they are cast and the task of tallying votes is eliminated. We may infer that the purpose of the proviso was to stop abuses in claiming pay for overtime in excess of time actually necessary to complete the election. If the officials were limited to $10 for the entire time worked during the day, such abuses could not have arisen, for the officials could not have received more than the $10 in any event.

The restriction on overtime payment "after the polls are closed" further indicates that overtime might accrue while the polls were still open, for otherwise the quoted language would have been unnecessary.

Another reason for reaching this conclusion is that since 1931 the polls remain open one hour longer in counties having a population over 150,000 (now 100,000) than in other counties. Art. 2930, V.C.S.; Sec. 9, Election Code. The Legislature must certainly have been aware of this fact in 1937 when it added the proviso to the Voting Machine Law pay provisions. It is unreasonable to assume that the Legislature intended to limit the total pay which an official might earn during the longer polling hours to the same amount which could be earned for less time in smaller counties.

The rate of pay under the general law was changed with the adoption of the Election Code so as to allow a maximum of $10 for a day of 10 working hours and $1 per hour for time worked in excess of 10 hours. Sec. 22, Election Code. No minimum is fixed in this statute. The provision in the Voting Machine Law fixing a minimum of "not less than the amount set now by law" has lost its significance if this language means the rate set under the Election Code. However, the maximum provisions in the Voting Machine Law are unaffected by the change in the general law. We therefore conclude that election officials serving in precincts where voting machines are used may receive a maximum of $10 for a 10-hour day, may receive overtime pay at the maximum rate of $1 per hour for time worked in excess of 10 hours during the time the polls are open, and may receive overtime pay at the maximum rate of $1 per hour for a maximum of two hours after the polls are closed.

Section 18 of Section 79 provides that the canvass of the election (i.e., the returns) shall be delivered in the same manner and to the same authority as now provided by law, but this statute is silent on the matter of pay for delivering the returns. Section 23 of Section 79 states that "the provisions of all other laws relating to the conduct of elections or primary elections shall so far as practicable, apply to the conduct of elections and primary elections where voting machines are used, unless herein otherwise provided." It is our opinion that the

general law should be applied here, and that the presiding officer is entitled to an additional $2 for delivering the returns to the proper authorities.  Sec. 22, Election Code.

In your third question you ask whether the paper ballot used in absentee voting must be the stub ballot, where voting machines have been adopted for use throughout the county.

Section 7 of Section 79 permits the authority charged with holding an election to determine by resolution whether absentee voting shall be by voting machine placed in the county clerk's office or by paper ballots.  With reference to the paper ballots it provides:

> ". . . Should the authority charged with holding an election determine by such resolution as above provided, that absentee votes cast at such election be cast by a paper ballot, then, and in such event, the authority charged with holding such election shall provide <u>a ballot for the casting of absentee votes as prescribed and provided by the general laws applicable to elections and to absentee voting</u> and those entitled under the law shall cast their vote by such ballot under the laws applicable to absentee voting . . . ."  (Emphasis added.)

The ballot prescribed by the general laws applicable to absentee voting is the stub ballot described in Sections 61 and 187 of the Election Code.  Sec. 38, Election Code.  This section states that "the ballot used in absentee voting, <u>except where voting machines are used</u>, shall be the stub ballot provided for elsewhere in this Code."  The underscored language was derived from Section 7 of House Bill 357, Acts 51st Leg., R.S. 1949, ch. 329, p. 615 (the stub ballot law), which read as follows:

> "The provisions of this Act shall not apply to elections in which voting machines are used as provided for elsewhere in this title."

In construing this provision, Attorney General's Opinion V-970 (1949) held that the stub ballot law was applicable to absentee voting in elections where paper ballots were used for absentee voting and voting machines were employed for other balloting.  We do not think the change in wording in carrying this provision into Section 38 of the Election Code has affected its meaning.  To our mind, the language in Section 38 means "except where voting machines are used <u>for absentee voting</u>."

It has been suggested by one of the officials in your

county that the stub ballot provisions were not intended to apply where the absentee ballots are to be registered on voting machines because there is no means for later identification of ballots cast by the voters who register their votes directly on the machines. We recognize the cogency of this argument as a basis on which the Legislature might provide for a different form of paper ballot for absentee votes which are to be registered on voting machines, but we are of the opinion that under the present statutes the Legislature has not done so. Section 79 of the Election Code permits the use of only the paper ballot prescribed by the general laws, and this we have held to be the stub ballot.

This official also advances the argument that the stub loses any value it may have possessed as soon as the ballot is recorded on the voting machine since in an election contest there is no way to determine how the ballot was recorded on the machine, and that the intention to require a useless procedure should not be ascribed to the Legislature.

We cannot agree with the premise that the stub has no value after the ballot is registered on the machine. In election contests, the stubs on absentee ballots serve the same purpose where voting machines are used for regular voting as they do where paper ballots are used.

If the issue in the contest is the accuracy of the count, the stubs serve no purpose even where paper ballots are used for regular voting. It is not necessary to know the voter's identity in order to determine whether his ballot has been tallied correctly. The stub serves a purpose only where the ballot was cast illegally. If it is found that a voter has voted illegally, his ballot may be identified by the stub and the vote deducted from the count, it being assumed in the absence of evidence to the contrary that the election officials tallied the ballot in accordance with the way it was marked.

The stubs serve the same purpose in election contests where voting machines are used, it likewise being assumed that the election officials registered the ballot on the voting machine in accordance with the way it was marked. Instead of having to place the illegal voter on the witness stand and elicit his testimony as to how he voted, his ballot may be identified by the stub and the deduction made from the information on the paper ballot. Certainly the paper ballot offers a much simpler and better source of information for eliminating the vote than does the voter's oral testimony. Although he would subject himself to conviction for perjury by testifying falsely, proof of the offense might be extremely difficult; and the voter's desire to assist some particular candidate might sway him to testify falsely that he voted for an opponent, in order to cause a reduction in the number of votes tallied for the opponent.

Hon. Raymond E. Magee, page 9          (V-1528)

As we see the matter, it reduces itself to a question of weighing the disadvantage of having to provide stub boxes against the advantage of simpler and more certain proof on illegal absentee ballots. The lack of such proof for ballots cast directly on voting machines results not from its uselessness but from its unavailability. Apparently the Legislature has thought that the advantage of such proof for the portion of the votes represented by absentee ballots outweighs the inconveniences involved.

The argument has also been advanced that the secrecy of the ballot is frustrated if a stub is attached. We are unable to perceive how the presence of the stub affects the secrecy of these ballots more adversely than it does the secrecy of any other ballot where the stub form is used. After the stub is removed, the only way in which the stub box may be opened and the stub matched with the ballot is by court order, as is the case where paper ballots are used for regular voting. Presence of the stub, with the voter's signature appearing on the reverse side, does not increase the opportunity for violating the ballot's secrecy before the stub is removed. The ballot is accompanied by papers which identify the person who marked it, and the stub does not reveal anything further to persons who might have access to the ballot before removal of the stub. Possibility that election officials or others may learn how a particular voter has marked his ballot is inherent in our present system of absentee voting by paper ballot, but it is not increased by the use of the stub ballot.

From what we have said, it follows that we have not found any of these arguments to be conclusive of an absence of legislative intent to make the stub ballot mandatory in absentee voting by paper ballot where voting machines have been adopted for regular voting.

The Voting Machine Law does not make express direction for the disposition of accepted absentee ballots and stubs after the election is completed. However, in accordance with the provision in Section 23 of Section 79 which makes the general law applicable unless otherwise provided, it is our opinion that the same disposition should be made of these records as is provided under the general law. The ballot boxes containing the voted ballots should be returned to the county clerk and disposed of in accordance with Section 114 of the Election Code, and the stub boxes should be returned to the district clerk and disposed of in accordance with Section 97 of the Election Code.

Summary

The number of election officers required in

election precincts using voting machines is three:
a presiding officer and two clerks.  Secs. 13 and
18 of Sec. 79, Election Code (V.C.S. Election Code,
Art. 7.14).  Section 24 of Section 79 prescribes
the maximum number of officers which may be appointed.

Election officials serving in precincts where
voting machines are used may receive a maximum of
$10 for a 10-hour day, and may receive additional
pay at the maximum rate of $1 per hour for time
worked in excess of 10 hours while the polls are
open and for a maximum of two hours after the polls
are closed.  The presiding officer is entitled to
an additional $2 for delivering the returns of the
election to the proper authorities.

Where paper ballots are used for absentee
voting in counties which have adopted voting
machines, the ballot must be the stub ballot
described in Sections 61 and 187, Election Code.
Att'y Gen. Op. V-970  (1949).

Yours very truly,

PRICE DANIEL
Attorney General

By s/Mary K. Wall
   Mary K. Wall
   Assistant

APPROVED:

J.C. Davis, Jr.
County Affairs Division

E. Jacobson
Reviewing Assistant

Charles D. Mathews
First Assistant

MKW:wb:wc